UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
PARIS HILTON, PARLUX FRAGRANCES,
LLC,

                            Plaintiffs,              **REPORT AND**
                                                   **RECOMMENDATION**

          -against-                      CV 12-5074 (JFB) (GRB)

INTERNATIONAL PERFUME PALACE, INC.,
JOHN DOE DEFENDANTS 1-10,

                            Defendants.
------------------------------------------------------------X
**GARY R. BROWN, United States Magistrate Judge:**

Plaintiffs Paris Hilton ("Hilton") and Parlux Fragrances, LLC ("Parlux") (collectively, "plaintiffs") brought this action against International Perfume Palace, Inc. ("IPP" or "defendant") and unnamed Doe defendants for federal and New York state claims including, *inter alia*, trademark infringement and dilution, trade dress infringement, and unfair competition under the Lanham Act, 15 U.S.C. §§ 1051, *et seq.*  Complaint ¶¶ 46-110, Docket Entry ("DE") [1].  After defendant failed to answer or move with respect to the complaint, District Judge Joseph F. Bianco granted plaintiffs' motion for default judgment, Order Granting Mot. for Default J., Apr. 5, 2013, DE [23], and referred this matter to the undersigned for a report and recommendation as to the damages and other relief sought by plaintiffs.  Order, Apr. 5, 2013 DE [24].

After an inquest into damages, and upon plaintiffs' uncontested submissions of record, it is respectfully recommended, for the reasons set forth herein, that:

    (1) plaintiffs be awarded the total sum of $10,995.60 in monetary damages and disgorged profits;

    (2) plaintiffs be awarded attorney's fees and costs in the total amount of $53,768.52;

(3) defendant and its officers, agents, servants, employees, representatives, and any other persons in concert or participation with defendant, be permanently enjoined from engaging in any activities which infringe any of plaintiffs' rights, including infringing plaintiffs' design patents and offering for sale, selling, distributing, or marketing merchandise in any way that tends to deceive, mislead, or confuse the public into believing that defendant's merchandise in any way originates with, is sanctioned by, or affiliated with the Paris Hilton brand; and

(4) defendant be directed to turn over to plaintiffs for destruction, at its own expense, any Paris Paris products or other infringing merchandise in its possession, custody or control.

## BACKGROUND

**The Relevant Intellectual Property**

Plaintiff Hilton owns a trademark (the "trademark" or "mark") for use of the name "Paris Hilton" for fragrances and other beauty products.  Compl. ¶ 1; *see also id.* Ex. 1 (attaching copy of trademark registration).  According to the allegations of the complaint, Hilton has used the trademark in connection with a line of such merchandise (collectively "Paris Hilton products") "continuously and exclusively … since at least 2004." *Id.* ¶ 11.  Paris Hilton products are sold individually and as part of packaged gift sets for both men and women. *Id.* ¶¶ 12, 14.  Since June 2004, Parlux has had a licensing agreement with Hilton for the manufacture and distribution of Paris Hilton fragrances.  Hr'g Tr. 11:23-25, June 25, 2013, DE [30].

In connection with the trademark, Hilton also owns distinctive trade dress packaging (the "trade dress").[1]  Compl. ¶ 15.  Plaintiffs allege that the trade dress is distinctive of Paris Hilton

---

[1] The key elements of the trade dress for Paris Hilton fragrances are: "(i) cylindrical-shaped bottles; (ii) clear pink bottles for the women's fragrance and clear blue for the men's fragrance; (iii) a vertical black wave design overlaid

products, has acquired secondary meaning due to its longstanding use, is not functional, and is used as a source identifier for Paris Hilton products. *Id.* ¶¶ 21-24.

According to the complaint, Parlux is also the sole assignee of United States Design Patent No. D518,382 (the "design patent") for an "ornamental design for a bottle and cap . . . ." *Id.* ¶¶ 2, 40, Ex. 2. The design patent covers many of the ornamental characteristics of a bottle associated with Paris Hilton fragrances, including the transparent cylindrical bottle and the wave pattern superimposed on the surface of the bottle and cap. *Id.* ¶ 41, Ex. 2.

**Defendant's Infringement**

Fairly read, the allegations of the complaint portray defendant as distributor of a line of products designed to mimic Paris Hilton products and profit from the latter's popularity. Plaintiffs apparently found defendant selling fragrances and personal beauty products (collectively "Paris Paris products") in bottles and packaging similar to Paris Hilton products at an August 2012 trade show in Las Vegas, Nevada. *Id.* ¶¶ 25-26, 31-37. IPP allegedly exhibited and offered for sale its products under the name "Paris Paris." *Id.* ¶¶ 26, 28. Plaintiffs are not affiliated with IPP and have not "authorized or endorsed [d]efendant's use, sale and/or distribution of any products." *Id.* ¶ 27. "The Paris Paris fragrances and beauty products sold by IPP are packaged and labeled in a style and manner intentionally and confusingly similar to the

---

on the bottle; and (iv) the brand name Paris Hilton written in black, lower case, and cursive font against a silver background." Compl. ¶ 17. The key elements of the trade dress for Paris Hilton beauty products are: "(i) black tubes and (ii) the brand name Paris Hilton written in cursive lettering and displayed vertically in metallic pink (for women) or metallic blue (for men)." *Id.* ¶ 18. The key elements of the trade dress of the packaging for individual Paris Hilton fragrances are: "(i) metallic pink (for women) or metallic blue (for men) boxes; (ii) a vertical black wave design overlaid on the box; (iii) and [sic] the brand name Paris Hilton written in metallic silver, lower case, and cursive font running vertically up the right side of the box." *Id.* ¶ 19. The key elements of the trade dress of the packaging for Paris Hilton gift sets are: "(i) metallic pink (for women) or metallic blue (for men) boxes; (ii) a vertical black wave design overlaid on the box; (iii) and [sic] the brand name Paris Hilton written in silver, lower case, and cursive font running vertically up the right side of the box." *Id.* ¶ 20.

PARIS HILTON products."[2]  *Id.* ¶ 31.  Plaintiffs allege that defendant infringed their protected trademarks, trade dress, and design patent, and that such infringement was willful.  *Id.* ¶ 51.

Along the lines of the familiar adage that a picture is worth a thousand words, the similarity between the products can best be seen by comparing the images below:[3]

 

The most cursory glance at these images quickly reveals that the defendant's products can be considered nothing other than knockoffs.

### The Instant Action

Plaintiffs filed the complaint in this action on October 10, 2012.  Compl.  Plaintiffs bring claims for trademark infringement, trade dress infringement, unfair competition, false designation of origin, and trademark dilution pursuant to the Lanham Act, 15 U.S.C. §§ 1051, *et*

---

[2] Paris Paris products bear the following features similar to the Paris Hilton products: "(i) a cylindrical bottle in clear pink for the women's fragrance and clear blue for the men's, both with a black wave design overlaid; and (ii) the name Paris Paris written in black, lower case, and cursive font against a silver background on the 3.4 oz bottles."  *Id.* ¶ 32.  Paris Paris women's and men's shower gel and women's body lotion feature "a black tube with Paris Paris written in cursive lettering and displayed vertically in metallic pink [for women and] . . . metallic blue [for men]."  *Id.* ¶¶ 33-34.  Packaging for the Paris Paris women's fragrance features "metallic pink boxes with a black wave design and Paris Paris written in metallic silver, lower case, and cursive font running vertically up the right side of the box."  *Id.* ¶ 35.  Packaging for the Paris Paris men's and women's boxed sets feature "metallic pink boxes with a black wave design and Paris Paris written in metallic silver, lower case, and cursive font running vertically up the right side of the box (women) and blue boxes with a black wave design (men)."  *Id.* ¶ 36.  The inside packaging of the Paris Paris gift sets also features characteristics similar to that of Paris Hilton gift sets.  *Id.* ¶ 37.

[3] While plaintiffs supplied images of their products and those sold by defendants, the images were relatively low quality and not suitable for reproduction.  The images above appear on the following blog page: http://www.tracyjonglawfirm.com/ipblog/?p=594.   In presenting these graphics, the author noted that "in researching for this article, it was hard to find images of the alleged infringer."  Id.  The blog article provides an interesting analysis of the similarities between the products.

*seq.*; design patent infringement under 35 U.S.C. §§ 271 and 289; unfair competition under New York common law; and violations of New York General Business Law for trademark and trade dress infringement, trade dress dilution, and deceptive acts and practices.  *See generally* Compl. The complaint seeks injunctive relief and monetary damages, including actual damages, disgorgement of defendant's profits, punitive damages, attorney's fees and costs, interest, and statutorily authorized enhancements of such awards.  *See* Compl., 'Wherefore' clause.

Following the entry of default by the Clerk, DE [7], plaintiffs moved for default judgment.  Motion for Default Judgment, Jan. 29, 2013, DE [15] (hereinafter "Motion").  Judge Bianco granted the motion and ordered an inquest into damages.  Order Granting Mot. for Default J., Apr. 5, 2013, DE [23].  Judge Bianco then referred the matter to the undersigned for a report and recommendation as to the relief sought.  Order, Apr. 5, 2013, DE [24].

Plaintiffs served defendant with written discovery demands and sought to depose a representative for defendant, but was unable to secure responses.  *See* Letter Mot. to Compel, Dec. 27, 2012, DE [8]; Declaration of Zachary W. Silverman ¶ 6, Jan. 29, 2013, DE [16] ("Silverman Declaration").  In the absence of such discovery, plaintiffs claim that "it would be impossible to know how much infringing Paris Paris product was distributed by IPP unless Plaintiffs subpoenaed every single fragrance retailer in the country…."  Silverman Decl. ¶ 13.

Plaintiffs did adduce some evidence of IPP's sales from third parties, and proffered limited data concerning plaintiffs' own sales and profits.  One third-party cosmetics distributor testified to purchasing 12 units each of men's and women's Paris Paris boxed gift sets (24 units total) at a purchase price of $6.50 per unit.  Silverman Declaration Ex. A ("Israil Declaration").  Plaintiffs submitted an invoice on defendant's letterhead directed to another third-party cosmetics distributor, listing 144 units of Paris Paris product – apparently 3.4-ounce spray

perfume bottles – at $2.50 per unit.  *Id.* Ex. B.  Plaintiffs also submitted an affidavit from

Parlux's President and CEO, Michael Katz, setting forth the retail price, cost, and profit per unit

sold for each of plaintiffs' products corresponding to the documented Paris Paris merchandise.

Sealed Letter Ex. A, Jan. 31, 2013, DE [18] ("Katz Declaration").  At an inquest before the

undersigned, witnesses for the third-party distributors testified to IPP's sales of Paris Paris

products, and a Parlux representative testified to plaintiffs' revenues and profits per unit of

authentic product sold.

 Plaintiffs' motion seeks damages under the Lanham Act, pursuant to 15 U.S.C. § 1117.

Silverman Decl. ¶ 18.  Specifically plaintiffs seek disgorgement of defendant's profits (or a

"much larger" multiple thereof, "as this Court finds to be 'just'"); treble plaintiffs' damages, in

the form of lost sales of genuine Paris Hilton product; and fees and costs.  *Id.* ¶ 21, 22-25.

Plaintiffs also seek a permanent injunction

> preventing IPP, as well as its officers, servants, employees, representatives,
> distributors, and any other persons in concert or participation with IPP, from
> engaging in any activities which infringe any of Plaintiffs' rights, including, but
> not limited to, infringing on Plaintiffs' design patents and offering for sale,
> selling, distributing, or marketing merchandise in any way that tends to deceive,
> mislead, or confuse the public into believing that IPP's merchandise in any way
> originates with, is sanctioned by, or affiliated with the Paris Hilton brand.  This
> would also specifically include a direction that IPP turn over to Plaintiffs (at IPP's
> expense) any Paris Paris or other infringing merchandise in its possession,
> custody, or control.

*Id.* ¶ 27.

## DISCUSSION

### Damages

 Even where liability is established, a default "is not considered an admission of

damages."  *Greyhound Exhibitgoup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir.

1992).  "The burden is on the plaintiff to establish its entitlement to recovery."  *Study Logic, LLC*

*v. Clear Net Plus, Inc.*, No. 11-CV-4343, 2012 WL 4329349, 2012 U.S. Dist. LEXIS 135847, at

\*14 (E.D.N.Y. Sept. 21, 2012).  "The district court must … conduct an inquiry in order to

ascertain the amount of damages with reasonable certainty."  *Credit Lyonnais Sec. (USA), Inc. v.*

*Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999).  "[D]etermin[ing] the appropriate amount of

damages[] … involves two tasks: determining the proper rule for calculating damages on such a

claim, and assessing plaintiff's evidence supporting the damages to be determined under this

rule."  *Id.*  "The court may conduct hearings . . . when, to enter or effectuate judgment, it needs

to: . . . (B) determine the amount of damages; [or] (C) establish the truth of any allegation by

evidence . . . ."  Fed. R. Civ. P. 55(b)(2).  However, it is also proper for the Court to "rely on

detailed affidavits or documentary evidence … to evaluate the proposed sum."  *Fustok v.*

*Conticommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989).

"Section 35(a) of the Lanham Act generally provides that a successful plaintiff under the

act shall be entitled, 'subject to the principles of equity, to recover (1) defendant's profits, (2) any

damages sustained by the plaintiff, and (3) costs of the action.'"  *George Basch Co. v. Blue*

*Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir. 1992) (quoting 15 U.S.C. § 1117(a)).  The sum

awarded should be compensatory and not punitive.  15 U.S.C. § 1117(a).  "[T]he statute's

invocation of equitable principles as guideposts in the assessment of monetary relief vests the

district court with some degree of discretion in shaping that relief.  Nevertheless, that discretion

must operate within legally defined parameters."  *George Basch*, 968 F.2d at 1537 (citations

omitted).

<u>Defendant's Profits</u>

The most straightforward – though admittedly incomplete – measure of relief in this

action is disgorgement of defendant's profits.  An award of the infringer's profits serves the

7

purposes of preventing unjust enrichment and deterring willful infringement, in addition to

providing an alternative measure of the mark holder's actual damages. *See Burndy Corp. v.*

*Teledyne Industries, Inc.*, 748 F.2d 767, 772 (2d Cir. 1984) (citing *W.E. Bassett Co. v. Revlon,*

*Inc.*, 435 F.2d 656, 664 (2d Cir. 1970)); *see also George Basch*, 968 F.2d at 1537-39 (discussing

three rationales for an accounting of profits).

The "well-settled law of this Circuit … requires … a finding of 'wilful deception' []for

an accounting of profits …." *Design Solange Ltd. v. Lane Bryant, Inc.*, No. 99-CV-7805, 2000

U.S. App. LEXIS 1857, at *3 (2d Cir. Feb. 3, 2000) (citing *George Basch*, 968 F.2d at 1537,

1540).[4]  However, "[a] defendant's default may be considered as evidence of willful

infringement," *Victoria Cruises, Inc. v. Yangtze Cruises, Inc.*, 630 F. Supp. 2d 255, 261

(E.D.N.Y. 2008), even conclusive evidence.  *See, e.g., Tiffany (NJ) Inc. v. Luban*, 282 F. Supp.

2d 123, 124 (S.D.N.Y. 2003) ("By virtue of the default, the Lubans' infringement is deemed

willful…."); *see also Prot. One Alarm Monitoring, Inc. v. Exec. Prot. One Sec. Serv., LLC*, 553

F. Supp. 2d 201, 207 (E.D.N.Y. 2008) (finding defendant's infringement willful when plaintiff

alleges willfulness and defendant fails to rebut allegation).  Moreover, it would be hard to view

as anything but willful defendant's virtual replication of the stylized Paris Hilton logo and the

packaging that compose the mark and dress at issue.  *See Kepner-Tregoe, Inc. v. Vroom*, 186

F.3d 283, 288 (2d Cir. 1999) ("The standard for willfulness is 'whether the defendant had

knowledge that [his] conduct represented infringement or perhaps recklessly disregarded the

possibility.'").

---

[4] District courts have found that, "under a plain reading of the statute, the willfulness requirement did not survive the [Trademark Amendments Act of 1999]." *Chanel, Inc. v. Veronique Idea Corp.*, 795 F. Supp. 2d 262, 268 (S.D.N.Y. 2011) (citing *Cartier v. Aaron Faber Inc.*, 512 F. Supp. 2d 165, 172-73 (S.D.N.Y. 2007)).  While this certainly is a fair reading of the amendment, *see* Pub. L. No, 106-43, 113 Stat. 218 (Aug. 5, 1999) (amending 15 U.S.C. § 1117(a) "by striking 'or a violation under section 43(a),' and inserting 'a violation under section 43(a), or a willful violation under section 43(c)'"), it is impossible to ignore the Second Circuit's ruling in *Design Solange* that post-dates the effective date of the act.

To recover defendant's profits under § 1117(a)(1), the plaintiff is required to prove defendant's sales only.  15 U.S.C. § 1117(a).  If costs are to be deducted from the sales in order to arrive at a net figure, the "defendant must prove all elements of cost or deduction claimed." *Id.*  Thus, a "plaintiff is entitled to recover [a defaulting defendant's proven] gross revenue . . . with no reductions for expenses."  *Harris v. Fairweather*, No. 11-Civ.-2152, 2012 WL 5199250, 2012 U.S. Dist. LEXIS 151696, at *5 (S.D.N.Y. Oct. 19, 2012).

Plaintiffs proffered the following undisputed evidence of defendant's sales: 12 units of men's gift sets at $6.50 per unit, 12 units of women's gift sets at $6.50 per unit, and 144 units of women's 3.4 ounce fragrance at $2.50 per unit.  Silverman Decl. Exs. A-B.  This yields a total of $516.00 in gross revenue to defendant.  Plaintiffs are entitled to recover this amount.

<u>Damages Sustained by Plaintiff</u>

Plaintiffs' counsel contends, in support of the instant motion, that plaintiffs "lose [their] profits for every sale of Paris Paris product sold instead of genuine Paris Hilton merchandise." Silverman Decl. ¶ 24.  And while Parlux's President and CEO, Michael Katz, testified to the retail price, cost, and profit per unit sold for each of the fragrances and sets at issue here, Katz Decl., establishing the amount of profits plaintiffs actually lost due to defendant's conduct has proven more challenging.

At the inquest, the Court endeavored to quantify this sum.  Parlux's Chief Operating Officer, Frank Buttacavoli ("Buttacavoli"), offered, "In the wholesale market, I knew that there were people that were talking about knock offs, and definitely there were some people who were not buying the product that used to buy the product."  Hr'g Tr. 16:15-18, June 25, 2013, DE [30]. Pressed by the undersigned to cite some measure of that injury, *id.* at 16:5-6 ("Do you have any data reflecting a dip in sales price, a loss of profits, or anything like that …?"), Buttacavoli

responded, "Without looking [at sales records], I could not tell you that." *Id.* at 16:8.  The undersigned provided plaintiffs' counsel the opportunity to supplement the record concerning plaintiffs' damages, but plaintiffs filed nothing further.

Ordinarily, "the quantum of damages, as distinguished from entitlement, must be demonstrated with specificity." *PPX Enters. v. Audiofidelity Enters.*, 818 F.2d 266, 271 (2d Cir. 1987) (citing *Monsanto Chemical Co. v. Perfect Fit Products Mfg. Co.*, 349 F.2d 389, 392 (2d Cir. 1965).  "Lost profits are [typically] calculated by estimating the revenue lost due to the infringing conduct and subtracting what it would have cost to generate that revenue." *Victoria Cruises*, 630 F. Supp. 2d at 262.  Plaintiffs should provide "sales and profits before and after defendants' breach" in order to quantify the decline in revenues. *See Flexitized, Inc. v. Nat'l Flexitized Corp.*, 335 F.2d 774, 779 (2d Cir. 1964); *see also Victoria Cruises*, 630 F. Supp. 2d at 262 ("a pre-infringement 'base line' must be established to predict what revenue plaintiff would have generated absent the infringement").  Plaintiffs must also demonstrate that defendant caused the decline in revenues by, for example, "proof of a general decline in sales or a disruption of anticipated business growth following the defendant's misconduct." *Victoria Cruises*, 630 F. Supp. 2d at 262 (quoting Restatement (Third) of Unfair Competition § 36 cmt. h (1995)).[5]

The Second Circuit recognizes, however, that "damages from trademark or trade dress infringement are often hard to establish," at least in part "due to the inherent difficulty in isolating the causation behind diverted sales and injured reputation." *George Basch*, 968 F.2d at

---

[5] Further, "it is well settled that in order … to receive an award of damages the plaintiff must prove either actual consumer confusion or deception …, or that the defendant's actions were intentionally deceptive thus giving rise to a rebuttable presumption of consumer confusion." *Champagne v. Diblasi*, 36 Fed. App'x 15, 17 (2d Cir. 2002) (quoting *George Basch*, 968 F.2d at 1537).  Because the willfulness of defendant's conduct here is clear and uncontested, as described above, this requirement is satisfied.

1539.  Thus, "courts may engage in 'some degree of speculation in computing the amount of damages, particularly when the inability to compute them is attributable to the defendant's wrongdoing.'"  *PPX Enters.*, 818 F.2d at 271 (quoting *Burndy*, 748 F.2d at 771).  "Any doubts regarding the amount of damages must be resolved against the infringer."  *Victoria Cruises*, 630 F. Supp. 2d at 262.

Here, plaintiffs' allegations of lost sales and profits associated with the infringement are not supported by a perfect record.  Plaintiffs have not claimed, much less demonstrated, a decline in revenues corresponding to defendant's entry into the marketplace.  Thus, plaintiffs' application for actual damages calls for "some degree of speculation."  *PPX Enters.*, 818 F.2d at 271.

However, the record does support the finding that defendant engaged in substantial distribution of infringing product, and that this infringement impacted plaintiffs' bottom line. Buttacavoli claims that "some people [in the market] were not buying the product that used to buy the product."  This conclusion is bolstered by the fact that the Paris Paris products are extremely similar in appearance to their authentic counterparts, and defendant's distribution of them appears widespread.  Defendant's sales apparently generated enough revenue to justify featuring the knock-offs at a national fragrance trade show.  Moreover, defendant's invoice, apparently sent to one of the purchasers of the infringing product, is labeled "Invoice # 1971." Silverman Decl. Ex. B.  Thus, a reasonable inference may be drawn that defendant engaged in hundreds or thousands of wholesale sales of Paris Hilton knock-offs, and may have enjoyed substantial success in copying and distributing the infringing goods, with a concomitant loss in profits to plaintiffs.

Plaintiffs have been able to secure detailed evidence concerning two distribution level transactions of infringing product; their inability to document additional sales may be attributed to defendant's default and failure to provide discovery in this matter.  Principles of fairness demand that plaintiffs be awarded, as they request, the profits that they would have generated had the two purchasers identified instead bought genuine Paris Hilton products.  *See George Basch*, 968 F.2d at 1537 ("both damage and profit awards may be assessed 'according to the circumstances of the case'").

Plaintiffs have proven the sale of 12 units of Paris Paris men's gift set, 12 units of the women's gift set, and 144 units of the women's 3.4 oz. fragrance.  Silverman Decl. Exs. A-B. Plaintiffs' corresponding average profit per unit on these products is $10.26 for the men's gift set, $13.36 for the women's gift set, and $11.54 for the women's 3.4-ounce fragrance.  Katz Decl.  This amounts to $123.12 in lost profits corresponding to sales of the men's gift set; $160.32 corresponding to the women's gift set; and $1,661.76 for the women's 3.4-ounce fragrance.  Plaintiffs should, in equity, be awarded $1,945.20 as actual damages.

Multiplication of Damages

The Lanham Act provides, "In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount."  15 U.S.C. § 1117(a).  The multiplier is "simply a recognition of the problems of proof facing plaintiffs and that if the amount proven is inadequate, 'a reasonable sum in the way of ordinary damages ought to be awarded.'"  *Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103, 111 (2d Cir. 1988) (quoting Trade-marks: Hearings on H.R. 102, H.R. 5461, and S. 895 Before the Subcomm. On Trade-marks of the House Comm. On Patents, 77th Cong., 1st Sess. 203 (1941)).  Courts in this Circuit have

found that willful infringement warrants trebled damages.  *Study Logic*, 2012 WL 4329349, at

*15 (citing *Tanning Research labs, Inc. v. Worldwide Import & Export Corp.*, 803 F. Supp. 606.

610 (E.D.N.Y. 1992)).

In light of the potential amount of undiscovered infringing sales; defendant's default; and

the latter's refusal to provide discovery in this action, plaintiffs are entitled, as a matter of equity,

to the treble damages they seek.  Plaintiffs here face a substantial "problem[] of proof," *Getty*

*Petroleum*, 858 F.2d at 111 – they can confidently contend that Paris Paris products are

diminishing sales of the authentic counterpart, but can prove only a handful of infringing

transactions.  Defendant has skirted the discovery procedures designed to disclose how many

sales have taken place.  Thus, the undersigned recommends that plaintiffs' actual damages be

trebled to the sum of $5,835.60.

"If the court shall find that the amount of the recovery based on profits is . . . inadequate .

. . the court may in its discretion enter judgment for any such sum as the court shall find to be

just, according to the circumstances of the case."  15 U.S.C. § 1117(a).  "[B]oth damage and

profit awards may be assessed according to the circumstances of the case."  *George Basch*, 968

F.2d at 1537 (internal quotation marks omitted); *see Foxtrap, Inc. v. Foxtrap, Inc.*, 671 F.2d 636,

641 (D.C. Cir. 1982) ("Under … the Lanham Act, … [t]he trial court may award up to treble the

actual damages, and adjust the award of profits as he deems just, depending upon the

circumstances of the case.").  In light of the evidence adduced concerning the invoice number

and trade show participation detailed above, plaintiffs could arguably be entitled to disgorgement

of profits in an amount hundreds or even thousands of times larger than the award here.

However, without direct proof of such numerous sales, the amount that the Court "find[s] to be

just, … constitut[ing] compensation and not a penalty," 15 U.S.C. § 1117(a), is ten times

defendant's profits demonstrated above.  Accordingly, the undersigned recommends that plaintiffs be awarded disgorged profits in the total amount of $5,160.00.

### Costs of the Action

Plaintiffs allege that they are entitled to the costs incurred in this action.  Silverman Decl. ¶ 25.  Plaintiffs claim that their costs total $3,502.77.  *See* Inquest Ex. D (on file with Court). Counsel proffered at the inquest "spreadsheets that memorialize … disbursements that were incurred by the Plaintiffs . . . in this action, and that were charged to them and that they paid for." Hr'g Tr. 18:19-24, June 25, 2013.

The Lanham Act provides for costs as an element of monetary recovery.  *See* 15 U.S.C. § 1117(a).  "Courts generally award costs to prevailing parties in cases involving violations of the Lanham Act." *Prot. One Alarm*, 553 F. Supp. 2d at 210.  "Out-of-pocket litigation costs are generally recoverable if they are necessary for the representation of the client." *Tri-Star Pictures, Inc. v. Unger*, 42 F. Supp. 2d 296, 306 (S.D.N.Y. 1999).  Such costs may include the filing fee, *Prot. One Alarm*, 553 F. Supp. 2d 201, 210 (E.D.N.Y. 2008); the costs of transcripts and messenger services, *Pastre v. Weber*, 800 F. Supp. 1120, 1123 (S.D.N.Y. 1991); and the costs of photocopying, postage, exhibits, typing, transportation and parking fees, *Kuzma v. IRS*, 821 F.2d 930, 933 (2d Cir. 1987).  The costs of online research are considered an element of the attorney's fee award.  *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 369 F.3d 91, 98 (2d Cir. 2004) ("the charges for … online research may properly be included in a fee award").

Most of plaintiffs' costs were incurred after defendant's default was entered, and may relate to plaintiffs' efforts to obtain discovery from defendant and third parties who, in the absence of defendant's participation here, represented the sole sources of evidence as to

14

plaintiffs' damages.  *See id.*  Accordingly, the costs appear reasonably attributable to plaintiffs'
representation here.

As such, plaintiffs should be awarded the disbursements sought, with the exception of
"court watch fees."  Plaintiffs list $1,894.00 in process service costs, the $350.00 filing fee,
$373.50 in photocopying, $59.25 in "[f]ees for court watch services," $655.32 in legal research
costs, $133.62 in postage, and $37.08 in travel expenses.  Inquest Ex. D.  The authorities support
recovery of disbursements of the nature cited here, save those for "court watch services."
Whereas an attorney's fees award is justified here, as set forth below, legal research costs should
be included in the costs awarded.  Accordingly, plaintiffs should be awarded the total sum of
$3,443.52 in disbursements.

**Attorneys' Fees**

Plaintiffs also seek an award of attorney's fees.  Silverman Decl. ¶ 25.  The Lanham Act
permits an award of reasonable attorneys' fees in exceptional circumstances.  15 U.S.C. §
1117(a).  Exceptional circumstances include those "where a party has willfully misappropriated a
mark or has defended an action in bad faith."  *Champagne*, 36 Fed. App'x at 19.  Thus, an award
of reasonable attorneys' fees appears warranted in this action.

"The presumptively reasonable fee boils down to what a reasonable, paying client would
be willing to pay.  *Simmons v. N.Y. City Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009)
(quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 493 F.3d 110,
117 (2d Cir. 2007)).  "The presumptively reasonable fee is comprised of a reasonable hourly rate
multiplied by a reasonable number of expended hours."  *Prof'l Plumbing of Staten Island*, 2010
WL 6230530 at *7 (E.D.N.Y. Nov. 7, 2010) (quoting *Finkel v. Omega Commc'n Servs., Inc.*, 543
F. Supp. 2d 156, 164 (E.D.N.Y. 2008)) (internal quotation marks omitted).  "The burden is on

15

the moving party to show that the requested fees are reasonable." *Prot. One Alarm*, 553 F. Supp. 2d at 208 (citing *Cruz v. Local No. 3, IBEW*, 34 F.3d 1148, 1160 (2d Cir. 1994)).

The Second Circuit directs that courts generally adhere to the "forum rule," that is: "the district court should generally use the prevailing hourly rate in the district where it sits to calculate . . . the presumptively reasonable fee." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. Of Albany*, 522 F.3d 182, 193-94 (2d Cir. 2007) (internal quotation marks omitted). "Recent opinions issued by courts within the Eastern District of New York have found reasonable hourly rates to be approximately $300-$450 for partners, $200-$325 for senior associates, and $100-$200 for junior associates." *Pall Corp. v. 3M Purification Inc.*, No. 97-CV-7599, 2012 U.S. Dist. LEXIS 76755, at *11-12 (E.D.N.Y. June 1, 2012) (collecting cases) (ruling on fee application by patent attorneys).

> [W]hen faced with a request for an award of higher out-of-district rates, a district court must first apply a presumption in favor of application of the forum rule. In order to overcome that presumption, a litigant *must persuasively establish* that a reasonable client would have selected out-of-district counsel because doing so would likely (not just possibly) produce a substantially better net result.

*Simmons*, 575 F.3d at 175 (emphasis added).

Plaintiffs seek $60,000.98 in attorneys' fees. Inquest Ex. C. Plaintiffs' counsel, Edwards Wildman Palmer LLP, a firm located in midtown Manhattan, submitted a spreadsheet that memorialized legal fees plaintiffs allegedly incurred from September 12, 2012 to May 28, 2013. *See id.* Six attorneys, one law clerk, and one paralegal expended a total of 163.75 hours on this matter. *Id.* A chart displaying the hours worked and hourly rate billed for these employees from September 12, 2012 to December 31, 2012 and January 1, 2013 to May 28, 2013 follows:

| Position | 2012 Hours | 2012 Rate | 2013 Hours | 2013 Rate |
|---|---|---|---|---|
| Partner I | 37.15 | $645.00 | 3.5 | $675.00 |
| Partner II | 0.6 | $575.00 | 0 | |

| Counsel[6] | 12 | $515.00 | 8.5 | $540.00 |
|---|---|---|---|---|
| Mid-Level Associate I | 36.9 | $305.00 | 0 | |
| Mid-Level Associate II | 0 | | 21.4 | $325.00 |
| Junior Associate | 0 | | 3.1 | $255.00 |
| Paralegal | 28.5 | $230.00 | 6.1 | $230.00 |
| Law Clerk | 2.6 | $230.00 | 2.4 | $230.00 |

*See id.*; Hr'g Tr. 21:23-25, 22:1-23, June 25, 2013 (identifying titles of respective personnel).

Plaintiffs' counsel does not include any additional evidence of attorneys' or paralegals'

professional experience, nor did they submit additional evidence attesting to the reasonableness

of the fees charged.

"Where the moving party fails to provide information on the attorneys' and paralegals'

backgrounds and experience, courts have used their discretion to award fees at a rate lower than

requested." *Prot. One Alarm*, 553 F. Supp. 2d at 209.  The *Pall* court rejected, on a much more

fulsome record, patent attorney rates of

> $565 to $684 per hour for … a partner with nineteen years of experience; … $490
> to $628 per hour for … a partner with eleven years of experience; … $395 to
> $535 per hour for … a senior associate with six years of experience; … [and]
> $165 to $209 per hour for … a legal assistant….

*Pall Corp.*, 2012 U.S. Dist. LEXIS 76755, at *12-13.  The court applied rates at the upper end of

the typical fees in the Eastern District.  *Id.*

Accordingly, the undersigned recommends here that partners and counsel be

compensated at the rate of $450.00 per hour, mid-level associates be compensated at the rate of

$325.00 per hour, junior associates be compensated at the rate of $200.00 per hour, and non-

attorney staff be compensated at the rate of $75.00 per hour.  Accordingly, the undersigned

recommends a total fee award of $50,325.00 in this matter.

---

[6] As used here, "Counsel" denotes a position "between associate and partner."  Hr'g Tr. 22:3, June 25, 2013.

**Permanent Injunction**

Finally, plaintiffs seek an injunction to prevent IPP or any associated entities from engaging or participating in any infringing activity.  Silverman Decl. ¶ 27.  Section 43 of the Lanham Act permits the owner of a distinctive mark to obtain a permanent injunction when another person uses the mark or a trade name in commerce that is likely to dilute the famous mark.  15 U.S.C. § 1125(c)(1).  Courts may issue an injunction against a defaulting defendant where a plaintiff demonstrates:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also U.S. Polo Ass'n v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 539 (S.D.N.Y. 2011) ("Salinger [v. Colting, 607 F.3d 68 (2d Cir. 2010)] suggest[s] that these cases should be analyzed under the standards for injunctive relief articulated by the Supreme Court in eBay, Inc. v. MercExchange, L.L.C.").

Irreparable Injury and Inadequacy of Monetary Damages

"After *eBay*, … courts must not simply presume irreparable harm. Rather, plaintiffs must show that, on the facts of their case, the failure to issue an injunction would actually cause irreparable harm." *Salinger v. Colting*, 607 F.3d 68, 82 (2d Cir. 2010).  "The relevant harm is the harm that (a) occurs to the parties' legal interests and (b) cannot be remedied [otherwise]. The plaintiff's interest is, principally, a property interest in the copyrighted material." *Id.* at 81. "Harm might be irremediable, or irreparable, for many reasons, including that a loss is difficult to replace or difficult to measure, or that it is a loss that one should not be expected to suffer." *Id.*

18

"The first and second factors in the *eBay* test often blend together…." *Fresh Del Monte Produce v. Del Monte Foods Co.*, No. 08-Civ.-8718, 2013 U.S. Dist. LEXIS 44945, at *19 (S.D.N.Y. Mar. 28, 2013).  In assessing irreparable injury, "the court must … pay[] particular attention to whether the 'remedies available at law, such as monetary damages, are inadequate to compensate for that injury.'" *Salinger*, 607 F.3d at 80 (quoting *eBay*, 547 U.S. at 391).  In the intellectual property context,

> where confusion about the origin of goods . . . leads to damage to reputation or loss of a potential relationship with a client that 'would produce an indeterminate amount of business in years to come[,]' monetary damages are difficult to establish and are unlikely to present an adequate remedy at law.

*Mamiya Am. Corp.*, No. 09-CV-5501, 2011 WL 1322383, 2011 U.S. Dist. LEXIS 34991, at *26 (E.D.N.Y. Mar. 11, 2011) (quoting *Register.com v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004)).

Monetary remedies are inadequate here.  Absent a Court directive to cease the infringing activities, plaintiffs would be forced to remedy each new infringement through a separate, full-blown lawsuit for monetary damages.  Against such a backdrop, defendant may well presume that plaintiffs cannot afford to effectively police the distribution of the infringing product.  This would encourage continued infringement.  Plaintiffs require a more expedient remedy for defending their mark.

Moreover, the injury plaintiffs may suffer absent the injunction is likely irreparable.  Parlux's COO proffered, "In the wholesale market, I knew that there were people talking about knock offs …"  Hr'g Tr. 16:15-16, June 25, 2013.  Thus, there is evidence that defendant's conduct has already tarnished plaintiffs' brand.  To permit any further distribution of the infringing products would subject the legitimate product to further dilution in value.  Plaintiffs "should not be expected to suffer" such an outcome. *Salinger*, 607 F.3d at 81.

Balance of Hardships

"The balance of hardships clearly tips in plaintiff's favor … where it has established irreparable harm[,] … [distribution of] the infringing conduct is likely to continue absent injunctive relief … [and] plaintiff has already incurred substantial legal costs in protecting its trademark rights…." *AW Indus. v. Sleepingwell Mattress, Inc.*, No. 10-CV-04439, 2011 U.S. Dist. LEXIS 111889, at *33 (E.D.N.Y. Aug. 31, 2011).  The Court faces an identical case here.  Accordingly, the balance of hardships tips in plaintiffs' favor.

Public Interest Would be Served by an Injunction

The public interest is served by an injunction in this case.  First, "the public has an interest in not being deceived—in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality." *N.Y. City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F.Supp.2d 305, 344 (S.D.N.Y. 2010) (citing *SK & F, Co. v. Premo Pharm. Labs., Inc.*, 625 F.2d 1055, 1067 (3d Cir. 1980)).  This is especially true in the case of personal beauty products: a fragrance, serum, or lotion that contains an unlisted and/or dangerous ingredient can create substantial health risks for the public.  Placing another's mark on a knock-off deceives the public into believing that the product was subject to the mark holder's ordinary quality control procedures, when in fact it was not. *Cf. Tiffany (NJ) LLC v. Dong*, No. 11-Civ.-2183, 2013 U.S. Dist. LEXIS 114986, at *8 (S.D.N.Y. Aug. 9, 2013) (noting that "a laboratory analysis revealed that the [jewelry] replicas were composed of a white metal containing at most 4.75% silver, compared to [the mark holder's] authentic 'sterling silver' products, which contain 92.5% silver").  An injunction here would help protect the public's interest in both legitimate and safe beauty products.

20

Plaintiffs have established their entitlement to an injunction.  Accordingly, the Court recommends that defendant and its agents be enjoined from engaging in any activities that infringe on plaintiffs' rights related to the mark, trade dress, and design patent at issue here.[7]

Destruction of Infringing Merchandise

As part of their request for a permanent injunction, plaintiffs request that IPP deliver any remaining Paris Paris merchandise to plaintiffs for destruction at IPP's expense.  Silverman Decl. ¶ 27.  Section 36 of the Lanham Act permits, as relevant here, courts to order the delivery and destruction of infringing articles upon a violation of 15 U.S.C. § 1125(a) or a willful violation of § 1125(c).  15 U.S.C. § 1118.  "The decision whether to order Defendant to 'deliver up and destroy' all [packaging and goods] bearing Plaintiff's trademark is committed to the Court's discretion."  *Breaking the Chain Found., Inc. v. Capitol Educ. Support, Inc.*, 589 F. Supp. 2d 25, 33 (D.D.C. 2008).  Where a permanent injunction against any further infringement is ordered, courts are sometimes reluctant to take the additional step of ordering existing infringing merchandise destroyed.  *See Fendi Adele S.R.L. v. Filene's Basement, Inc.*, 696 F.Supp.2d 368, 392 (S.D.N.Y. 2010) (denying § 1118 destruction of infringing merchandise when a permanent injunction against future infringement was awarded).  *See also Breaking the Chain Found.*, 589 F. Supp. 2d at 33 ("[W]here an injunction is issued under the Lanham Act enjoining an infringer from further infringement, the rights of the plaintiff are adequately protected and an order requiring destruction of infringing articles, though permitted, may be unnecessary.") (quoting *Kelley Blue Book v. Car-Smarts, Inc.*, 802 F. Supp. 278, 293 (C.D. Cal. 1992)).

---

[7] The full text of the injunctive relief recommended is set forth below.  Although plaintiffs request that "distributors" be enjoined along with defendant and its agents, it is unclear that the former fall within the ambit of the statute, *see* 15 U.S.C. § 1125 (permitting injunction against anyone who "use[s] … a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark"), nor that this Court can properly enjoin their activities without affording them an opportunity to be heard.

Here, however, defendant may possess a vast store of infringing goods.  Defendant's representations that it is contemplating winding up its business, Letter Mot. to Compel, DE [8], are neither verifiable nor a reliable indicator that its existing knock-offs will not be distributed. Accordingly, plaintiffs' request that defendant be ordered to deliver up for destruction the infringing merchandise should be granted.

## CONCLUSION

For the reasons set forth herein, it is respectfully recommended that:

(1) plaintiffs be awarded the total sum of $10,995.60 in monetary damages and defendant's disgorged profits;

(2) plaintiffs be awarded attorney's fees and costs in the total amount of $53,768.52;

(3) defendant and its officers, agents, servants, employees, representatives, and any other persons in concert or participation with defendant, be permanently enjoined from engaging in any activities which infringe any of plaintiffs' rights, including infringing plaintiffs' design patents and offering for sale, selling, distributing, or marketing merchandise in any way that tends to deceive, mislead, or confuse the public into believing that defendant's merchandise in any way originates with, is sanctioned by, or affiliated with the Paris Hilton brand; and

(4) defendant be directed to turn over to plaintiffs for destruction, at defendant's expense, any Paris Paris product or other infringing merchandise in its possession, custody or control.

## OBJECTIONS

A copy of this Report and Recommendation is being mailed to the representatives of each of the parties.  Any written objections to this Report and Recommendation must be filed with the

22

Clerk of the Court within fourteen (14) days of service of this report.  28 U.S.C. § 636(b)(1)

(2006 & Supp. V 2011); Fed. R. Civ. P. 6(a), 72(b).  Any requests for an extension of time for

filing objections must be directed to the district judge assigned to this action prior to the

expiration of the fourteen (14) day period for filing objections.  **Failure to file objections within**

**fourteen (14) days will preclude further review of this report and recommendation either**

**by the District Court of Court of Appeals.**  *Thomas v. Arn*, 747 U.S. 140, 145 (1985) ("[A]

party shall file objections with the district court of else waive right to appeal."); *Caidor v.

Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate's

report operates as a waiver of any further judicial review of the magistrate's decision.").


Dated: Central Islip, New York
      September 2, 2013

                                                /s/ Gary R. Brown_____
                                                GARY R. BROWN
                                                United States Magistrate Judge